THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KARL LEAVERTON,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>RBC CAPITAL MARKETS<br>CORPORATION, a Minnesota<br>corporation; ROYAL BANK OF<br>CANADA, a Canadian corporation;<br>ROYAL BANK OF CANADA US<br>WEALTH ACCUMULATION PLAN, an<br>employee benefit plan; and JOHN DOES<br>1-15, individuals,<br><br>　　　　　　　Defendants. | No. CV9-1804 RSL<br><br>DECLARATION OF GABRIELA SIKICH<br>IN SUPPORT OF DEFENDANTS' MOTION<br>TO DISMISS FOR FAILURE TO STATE A<br>CLAIM |

I, Gabriela Sikich, make the following declaration:

　　　1.　　　I am employed by RBC Capital Markets Corporation ("Capital Markets") as the

U.S. Defined Contribution Plan Manager.  I have personal knowledge of the facts contained in

this Declaration.

　　　2.　　　On November 1, 2008, RBC Capital Markets' ultimate parent company, Royal

Bank of Canada, promulgated an amended version of its U.S. Wealth Accumulation Plan ("the

DECLARATION OF GABRIELA SIKICH (NO.
CV9-1804 RSL) – 1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

66024-0006/LEGAL17857313.1

WAP"). This was the version of the WAP in effect at the time of plaintiff Karl Leaverton's termination on April 13, 2009. A true and correct copy of the WAP is attached as Exhibit A.

3.      Under its terms, the WAP is administered by the "Committee," which means the Head of Human Resources or those executives in the RBC family of companies designated by the Head of Human Resources to administer the WAP. The Head of Human Resources has designated five individuals to serve as the WAP Committee: Natalie Cadavid, Director – U.S. Retirement & Benefits; Dan Szabo, Director of Compensation – U.S. & International Banking; Lisa Sorenson, Director of Human Relations—RBC Wealth Management; Darryl Traweek, Regional Director—RBC Wealth Management; and Mary Zimmer, Head—Primary Advisory Services.

4.      On December 14, 2009, Mr. Leaverton sent a letter to RBC Capital Markets Senior Associate General Counsel Todd Schnell that appeared to be an attempt to initiate the claim procedure under the WAP, although Mr. Schnell is not a member of the WAP Committee. The letter was forwarded to the WAP Committee, which then began its review of Mr. Leaverton's eligibility for benefits. A true and correct copy of the December 14, 2009, letter is attached as Exhibit B.

5.      On May 11, 2009, Mr. Leaverton's attorney sent a letter to John Taft, the CEO of RBC Capital Markets. This letter was labeled as "Confidential For Settlement Purposes Only under ER 408." Mr. Taft is not a member of the WAP Committee and the letter does not state that Mr. Leaverton is entitled to benefits under the WAP. A true and correct copy of the May 11, 2009, letter, redacted to protect the confidentiality of Mr. Leaverton's proposed settlement terms, is attached as Exhibit C.

6.      On February 22, 2010, and March 5, 2010, the WAP Committee met to consider Mr. Leaverton's claim for unvested "Company Contributions" under the WAP. The Committee denied the claim. In response to his administrative inquiry, the WAP Committee also described the distribution schedule under which Mr. Leaverton will receive his vested benefits (his

DECLARATION OF GABRIELA SIKICH (NO. CV9-1804 RSL) – 2

66024-0006/LEGAL17857313.1

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

"Mandatory Deferred Compensation" and his "Voluntary Deferred Compensation") under the WAP. A true and correct copy of the March 8, 2010, letter from Mr. Schnell on behalf of the WAP Committee to Mr. Leaverton's attorney informing Mr. Leaverton of the WAP Committee's adverse benefit determination is attached as Exhibit D. Under the terms of the WAP, Mr. Leaverton has 60 days to request administrative review of the WAP Committee's adverse benefit determination with respect to his unvested Company Contributions.

I declare under penalty of perjury under the laws of the United States and State of Minnesota that the foregoing is true and correct.

Signed at Minneapolis, Minnesota this _11th_ day of March, 2010.

Gabriela Sikich

DECLARATION OF GABRIELA SIKICH (NO. CV9-1804 RSL) – 3

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

66024-0006/LEGAL17857313.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

## CERTIFICATE OF SERVICE

On March 11, 2010, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the following document:

## DECLARATION OF GABRIELA SIKICH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Patricia A. Eakes
Jeremy E. Roller
Yarmuth Wilsdon Calfo PLLC
818 Stewart Street, Suite 1400
Seattle, WA  98101

Attorneys for Plaintiff

   \_\_\_   Via hand delivery
   \_\_\_   Via U.S. Mail, 1st Class, Postage Prepaid
   \_\_\_   Via Overnight Delivery
   \_\_\_   Via Facsimile
   X   Via E-Filing
   \_\_\_   Other: _____

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 11th day of March, 2010.

/s/ Kevin J. Hamilton
Kevin J. Hamilton, WSBA No. 15648
KHamilton@perkinscoie.com
**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

CERTIFICATE OF SERVICE (NO. CV9-1804
RSL) – 1

66024-0006/LEGAL17857313.1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# Amended and Restated

## Royal Bank of Canada

## US Wealth Accumulation Plan

### And Prospectus

## The date of this document is NOVEMBER 1, 2008

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

RBC Financial Group

**EXHIBIT A**

# TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ........................................................................................1
  1.1  General Nature and Purpose of the Plan ..............................................1
  1.2  Definitions ...........................................................................................1
  1.3  Rules of Interpretation ........................................................................5

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS ..................................5
  2.1  Eligibility ..............................................................................................5
  2.2  Election to Voluntarily Defer Compensation .....................................5
  2.3  Mandatory Deferral of Compensation ................................................6
  2.4  Election of Investments........................................................................6
  2.5  Intra-Plan Transfers .............................................................................6
  2.6  Company Contributions ........................................................................6

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ....................7
  3.1  Company Common Shares. ..................................................................7
  3.2  Plan Interest Rate ................................................................................8
  3.3  Mutual Funds. .......................................................................................8
  3.4  Valuation ..............................................................................................9

SECTION 4 VESTING ................................................................................................9
  4.1  Vesting of Voluntary Deferred Compensation ...................................9
  4.2  Vesting of Mandatory Deferred Compensation and Company Contributions.................9
  4.3  Termination For Cause ........................................................................9
  4.4  Terminations due to Restructuring.....................................................10
  4.5  Change in Control. .............................................................................10
  4.6  Forfeitures ..........................................................................................10

SECTION 5 DISTRIBUTIONS ................................................................................10
  5.1  Distributions........................................................................................10
  5.2  Distribution Dates for Special Participants ......................................10
  5.3  Distribution Dates for Other Participants. ........................................11
  5.4  Change In Control ..............................................................................12
  5.5  Form of Distributions.........................................................................12
  5.6  Distributions to Beneficiaries ...........................................................13
  5.7  Designation of Beneficiary ................................................................13
  5.8  Disclaimers by Beneficiaries .............................................................14
  5.9  Federal Income Tax ...........................................................................14
  5.10  Tax Withholding ...............................................................................15
  5.11  ERISA Matters...................................................................................15

SECTION 6 SPENDTHRIFT PROVISIONS ........................................................16

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

SECTION 7 ADMINISTRATION ..................................................................................16
   7.1   The Committee..............................................................................................16
   7.2   Claims Procedure .........................................................................................16
   7.3   Making a Claim.............................................................................................16
   7.4   Requesting Review of a Denied Claim ........................................................16
   7.5   In General.....................................................................................................17

SECTION 8 OTHER ADMINISTRATIVE MATTERS ............................................17
   8.1   Reporting......................................................................................................17
   8.2   Plan Obligor; Status as Unsecured General Creditors...............................17
   8.3   Disclaimer of Employment and Bonus Rights.............................................18
   8.4   Administrative Expenses of the Plan ...........................................................18
   8.5   No Compensation Under the Qualified Plan ...............................................18
   8.6   Voting Rights.................................................................................................18
   8.7   Governing Law ..............................................................................................18

SECTION 9 AMENDMENT OR TERMINATION ...................................................19
   9.1   Amendments to and Termination of Plan ...................................................19
   9.2   Merger..........................................................................................................19
   9.3   Applicability to Successors...........................................................................19

# SECTION 1
# INTRODUCTION

**1.1     General Nature and Purpose of the Plan.**  The Royal Bank of Canada US Wealth Accumulation Plan (the "**Plan**") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "**Company**") and its Participating Subsidiaries (collectively, the "**Employers**") may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.  The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.  The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, and **is hereby further amended and restated effective for the Plan Year beginning on January 1, 2008**.  This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.

**1.2     Definitions.**

"**Account Balance**" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"**Adverse Benefit Determination**" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Cause**" means, as determined by the Committee or its assignee, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of

any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Committee or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Committee in good faith; <u>provided,</u> however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"**Change in Control**" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not a Company Affiliate, other Employer or Employer Affiliate. A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"**Committee**" means the Head of Human Resources, or those executives designated by the Head of Human Resources to administer this Plan. The members of the Committee, if any, serve at the pleasure of the Head of Human Resources, who have the power to appoint and remove members from time to time.

"**Company**" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign.

"**Company Contribution**" means additional contributions that may be made by the Company in the form of a Matching Contribution or a Discretionary Contribution.

"**Deferred Compensation**" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"**Disability**" means the disability of a Participant as defined in the Qualified Plan, <u>provided,</u> however, that for purposes of <u>Section 5.3(c)</u>, a Participant will be considered to have a Disability only if he or she, as determined by a doctor of medicine approved by the Committee, is receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of an Employer because of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

"**Discretionary Contribution**" means a Company Contribution described in <u>Section 2.6(b)</u>.

"**Election Form**" means the eligible Employee's written election setting forth (a) the percentage of an Employee's Gross Cash Compensation he or she elects to defer, (b) the

distribution dates for his or her Deferred Compensation and Company Contributions, and (c) such other information as determined by the Committee.

"**Employee**" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"**Employers**" means the Company and Participating Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"**FICA**" means the Federal Insurance Contribution Act.

"**Fund Addition Date**" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"**Gross Cash Compensation**" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates. Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation. If an Employee so elects at the time of entering into a business transition plan with an Employer, payments from a business transition plan are included in Gross Cash Compensation. The preceding sentence is applicable only for business transition plans entered into on or after January 1, 2007.

"**In-Service Payment Date**" means a distribution date, as elected by the Employee on his or her Election Form, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

"**Mandatory Deferred Compensation**" means the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee.

"**Matching Contribution**" means a Company Contribution described in <u>Section 2.6(a)</u>.

"**Matching Threshold Amount**" means an amount of Deferred Compensation, as determined by the Committee with respect to each Plan Year, that is credited to a Participant's account during such Plan Year that may be eligible for a Matching Contribution in accordance with standards and guidelines determined annually by the Committee.

"**Mutual Funds**" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"**Mutual Fund Price**" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

-3-

60673594_5

Decl. of G. Sikich - 10

"**NYSE**" means the New York Stock Exchange.

"**Participant**" means an individual who has an Account Balance.

"**Participating Subsidiary**" means a corporation, now or in the future, affiliated with the Company that adopts, or has adopted, the Plan.  No corporation may become a Participating Subsidiary without prior consent of the Committee.  Such participation is subject to such limitations as the Committee may impose and will cease upon a Change in Control of such Participating Subsidiary.

"**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"**Plan**" means the Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"**Plan Interest Rate**" means an interest rate determined from time to time by the Committee.

"**Plan Obligor**" means the party that is responsible for satisfaction of amounts payable to Participants.

"**Plan Year**" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"**Qualified Plan**" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

"**Retirement**" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"**Separation**" means the separation of employment from the Employers or any Employer Affiliate, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein.  Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"**Special Participant**" means a Participant who is classified by his or her Employer as a financial consultant in the Private Client Group (as defined by the Employers) and whose production is less than $350,000 per year (or such higher threshold as may be established by the Committee) during the fiscal year ended prior to the Plan Year for which Deferred Compensation is credited.

-4-

60673594_5

Decl. of G. Sikich - 11

"**Valuation Date**" means the business day that falls on or immediately after July 1 of each year that a distribution is due a Participant.

"**Voluntary Deferred Compensation**" means the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2.

**1.3     Rules of Interpretation.**  Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any particular paragraph or section of this Plan unless the context clearly indicates to the contrary.  The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof.  Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

**SECTION 2**
**DEFERRALS AND DEEMED INVESTMENTS**

**2.1     Eligibility.**

(a)     Employees eligible to participate in the Plan are any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeds a level deemed appropriate by the Committee and who are invited to become Participants by the Committee.

(b)     No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee:

(i)     who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered; or

(ii)     other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B).

**2.2     Election to Voluntarily Defer Compensation.**  Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year.  The Committee has the discretion to limit the amount of Voluntary Deferred Compensation or the amount of Gross Compensation that may be taken into account for making Voluntary Deferred Compensation contributions.  Elections must be made no later than December 31 of the year immediately preceding the year in which such Voluntary Deferred Compensation will be earned; provided, however, that subject to such changes as may be determined by the Committee, a new Employee who is eligible to participate in the Plan has 30 days from such Employee's hiring date to submit an Election Form for such Plan Year.  **For a given Plan Year, an election to defer compensation is irrevocable after it is accepted by the**

-5-

**Committee**. An election by an Employee who is first eligible to participate in the Plan during a given year becomes effective beginning the first day of the month following the date such Election Form is submitted and accepted by the Committee.

The Committee will from time to time establish the maximum percentage of a Participant's Gross Cash Compensation that he or she may elect to defer under the Plan. Voluntary Deferred Compensation will be deferred by payroll reduction.

**2.3     Mandatory Deferral of Compensation**. On each payroll date, the Employers will reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

**2.4     Election of Investments**. On each Plan Year's Election Form, a Participant (or Employee for the first Election Form) may choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee. The available hypothetical investments are described in <u>SECTION 3</u>. If a Participant fails to elect how deferrals are deemed to be invested, such Deferred Compensation will be deemed to be invested at the Plan Interest Rate.

Accounts for Participants will be established for bookkeeping purposes only and will not be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates. Such accounts will be established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the Plan Year. Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

**2.5     Intra-Plan Transfers**. Subject to such rules as the Committee, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have all or a portion of his or her Account Balance transferred to any other type of hypothetical investment (except that, before January 1, 2009, after the initial investment election, no transfer may be made into Company common shares, and Matching Contributions may be transferred from the form of Company common shares only in accordance with <u>Section 2.6(a)(iii)</u>). Participants may initiate an intra-Plan transfer by submitting a request in writing to the Company in such form as the Committee determines. Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Committee.

**2.6     Company Contributions**. The Committee will establish whether and the extent to which a Participant is eligible for one or more of the following types of Company Contributions:

(a)     *Matching Contributions*. The Company may make Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount, subject to the following:

(i)     The Matching Threshold Amount and related Matching Contributions may vary with certain performance-based measures established by

-6-

Decl. of G. Sikich - 13

the Participating Subsidiary, or such other performance factors as determined by the Committee. The Matching Threshold Amount will be based on a performance grid approved annually by the Committee and distributed to each Participant.

(ii)     If a Participant is entitled to a Matching Contribution, after the end of the Plan Year (or at such other time as the Committee, in its sole discretion, determines) his or her account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing the amount of such Matching Contribution by the closing price per Company common share on the NYSE as reported on the day of crediting.

(iii)     Effective January 1, 2009, the Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at the Participant's Separation, provided that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms. For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan. Prior to January 1, 2009, Participants may not diversify their Matching Contributions and related investment returns.

(b)     *Discretionary Contributions*.     The Company may make Discretionary Contributions in such other amount as determined by the Committee in its sole discretion. The Discretionary Contribution amount may vary from Participant to Participant and may be made based on any criteria, including recommendations from a Participating Subsidiary, as determined by the Committee.    If a Participant is entitled to a Discretionary Contribution, his or her account will be deemed to have been allocated the amount of such Discretionary Contribution on the date determined by the Committee. Such Discretionary Contribution will be invested as determined by the Committee in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time; provided that Discretionary Contributions invested in Company common shares may be diversified only after January 1, 2009.

## SECTION 3
## INFORMATION CONCERNING INVESTMENT ALTERNATIVES

**3.1     Company Common Shares.**

(a)     *Company Common Shares*.   For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

-7-

(b)   *Dividends on Company Common Shares*.  At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if dividends are declared in common shares), or in such other property determined by the Committee.

(c)   *Additional Purchases of Company Common Shares*.  All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Committee in its sole discretion) to purchase hypothetical Company common shares.  The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

**3.2    Plan Interest Rate**.  Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

**3.3    Mutual Funds**.

(a)   *Mutual Funds*.  A Participant may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and, effective January 1, 2009, Matching Contributions after a Separation classified by an Employer as a "retirement" deemed invested in a Mutual Fund.  A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)   *Interest or Dividends on Mutual Funds*.  On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date.  On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee.  Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

60673594_5

**3.4    Valuation.**  Except for changes resulting from intra-Plan transfers described in Section 2.5, the notional value of a Participant's accounts will be updated daily to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee.  The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Committee, which for 2008 is 0.000625.  The Committee will from time to time review this calculation and may change the decimal factor used in this calculation.

**SECTION 4**
**VESTING**

**4.1    Vesting of Voluntary Deferred Compensation.**  All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

**4.2    Vesting of Mandatory Deferred Compensation and Company Contributions.**  Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Committee, in its sole discretion.  The Committee will announce any prospective change in the vesting schedule with respect to Mandatory Deferred Compensation and Company Contributions (and the related investment returns, if any) prior to December 31 of the year preceding each new Plan Year.  Unless otherwise amended by the Committee, all time period measurements for the vesting schedules established by the Committee will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates.  Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

(a)    the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

(b)    the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has (a) entered into a business transition agreement with the Private Client Group or (b) met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Committee.  The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time.

**4.3    Termination For Cause.**  Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to

-9-

the Company. The Committee has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (x) a Participant has a voluntary Separation, and (y) the Committee thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he was involuntarily terminated for Cause for all purposes of this Plan.

4.4     **Terminations Due to Restructuring**.  In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as determined in the sole discretion of the Committee), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

4.5     **Change in Control**.   In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Committee), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

(a)     *Minimum Vesting*.  The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.   Before a Change in Control event, the Committee will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

(b)     *Discretionary Vesting*.  The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above.  In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

4.6     **Forfeitures**.  Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

5.1     **Distributions**.  Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

5.2     **Distribution Dates for Special Participants**.  Notwithstanding anything to the contrary in Section 5.1 or 5.3, but subject to Section 5.4, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant is a Special

-10-

Participant will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

**5.3     Distribution Dates for Other Participants**.

(a)     *Distribution Pursuant to the In-Service Payment Date*.  If the Participant selected an In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year.  With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

(b)     *Distribution on Separation or Retirement*.

(i)     If (A) the Participant elected payment on Separation on his or her Election Form or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business; <u>provided</u>, however, that any offset is limited to $5,000 and will occur at the same time and in the same amount as the debt otherwise would have been paid by the Participant.

(ii)     If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form.  Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)     Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter.  Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid.  For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be

-11-

equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)    If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

(v)    Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments.

(vi)    For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)    *Distributions Following Death or Disability*.  Distributions following death will follow the procedures set forth in Section 5.6.  Distributions following Disability will be made in a single payment to the Participant promptly after, but in no event after the 90th day following, the date the Participant satisfies the definition of Disability.

(d)    *Other*.  The Committee reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; provided, however, that no acceleration of distribution will be made in contravention of Code Section 409A.

5.4    **Distribution Due to a Change In Control**.  If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Committee), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated; provided, however, that, for purposes of complying with Code Section 409A, no payment under this Section 5.4 will be made before January 1, 2009.

5.5    **Form of Distributions**.

(a)    *Distributions of Company Common Shares*.

(i)    All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes.  Any Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

-12-

(ii)   The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

(iii)   All distributions will be in the form of whole Company common shares. Fractional shares, if any, will be distributed in cash.

(b)   *Distributions of Investments in Mutual Funds*. A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

(c)   *Distributions of Investment in the Plan Interest Rate*. A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding Section 5.5(b) or (c), as applicable, the Committee, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

**5.6   Distributions to Beneficiaries.**   Distribution of the Account Balance of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary or the Participant's estate in a single lump sum as of the date of the Participant's death. If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death. For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later. Notwithstanding the foregoing sentence, if the Committee is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Committee's receipt of the death notification, subject to any tax, interest, and penalties imposed by Section 409A.

**5.7   Designation of Beneficiary.**   Each Participant has the right to designate in writing, in form satisfactory to the Committee, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing. Any beneficiary designation must be received by the Committee before the Participant's death. Any beneficiary

-13-

60673594_5

Decl. of G. Sikich - 20

designation of a Participant's spouse will be made void in the event of a divorce, unless either a binding court order provides otherwise or the Participant redesignates his or her former spouse as the beneficiary.  If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's estate.

5.8     **Disclaimers by Beneficiaries**.  A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements.  To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death.  Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public.  A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed.  To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Committee after the date of the Participant's death but not later than 180 days after the date of the Participant's death.  A disclaimer will be irrevocable when delivered to the Committee.  A disclaimer will be considered to be delivered to the Committee only when actually received by the Committee.  The Committee will be the sole judge of the content, interpretation and validity of a purported disclaimer.  Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed.  A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of <u>SECTION 6</u> and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan.  The Committee will not  recognize any other form of attempted disclaimer.

5.9     **Federal Income Tax**.

(a)     *Tax Consequences of Participating in the Plan*.  The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates.  Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; provided, that, such amounts may still be subject to FICA taxes when deferred to the Plan.  Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation.  As described above and in <u>Section 5.10</u> below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

60673594_5

Decl. of G. Sikich - 21

(b)     *Compliance with Code Section 409A.*  Except as specifically provided in Section 5.6, it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A.  The provisions of the Plan will be interpreted and construed in favor of complying with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c)     *Participants Should Consult Their Tax Advisors.*  Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan.  These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis.  Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan.  Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions.  **Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.**

**5.10     Tax Withholding.**  All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld.  In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Committee will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations.  Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of an Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

**5.11     ERISA Matters.**  Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan" as defined by ERISA.  If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements.  A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

60673594_5

Decl. of G. Sikich - 22

## SECTION 6
## SPENDTHRIFT PROVISIONS

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in SECTION 4 and SECTION 5, nor will the same be subject to attachment, garnishment, execution following judgment or other legal process instituted by creditors of the Participant or the personal representative of the Participant.

## SECTION 7
## ADMINISTRATION

7.1    **The Committee.**  The Plan will be administered by the Committee.   The Committee has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Committee considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under Section 4.3; provided that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to the Plan having the effect of materially increasing the cost of the Plan to an Employer, including, without limitation, decisions regarding Company Contributions, eligibility to participate in the Plan, and discretionary vesting in the event of a Change in Control (as described in Section 4.5(b)).

7.2    **Claims Procedure.**  If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Committee in accordance with procedures set forth in this SECTION 7.

7.3    **Making a Claim.**  The claim must be written and must be delivered to the Committee within 90 days the Participant or beneficiary knows or should have known of his or her claim for benefits.  Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.  Notice of the claimant's right to request a review (as described in Section 7.4) will also be given to the claimant.

7.4    **Requesting Review of a Denied Claim.**  A claimant may request that a denied claim be reviewed.  The request for review must be written and must be delivered to the

-16-

Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination. A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits. The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents. Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision. If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth: (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

7.5   **In General**. All decisions on claims and on reviews of denied claims will be made by the Committee. The Committee also reserves the right to delegate its authority to make decisions. The Committee may, in its discretion, hold one or more hearings. If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired. The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this SECTION 7. Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under Section 7.4.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

8.1   **Reporting**. As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report. At its discretion, the Company may prepare and make available more frequent reports to Participants.

8.2   **Plan Obligor; Status as Unsecured General Creditors**.

(a)   The Company will be the Plan Obligor with respect to distributions from all accounts; <u>provided</u>, however, that the Participant's Participating Subsidiary will be the

-17-

Plan Obligor with respect to investments of Mandatory Deferred Compensation and related Company Contributions thereon, except as set forth in Section 8.2(b) below.

(b)    The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

(c)    All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers. The Plan does not require that any hypothetical investments under this Plan be funded by the Company. If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

**8.3    Disclaimer of Employment and Bonus Rights**.  The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation.  Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

**8.4    Administrative Expenses of the Plan**.  Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

**8.5    No Compensation Under the Qualified Plan**.  Unless the Qualified Plan specifically provides otherwise, no amounts of Deferred Compensation and related Company Contributions, if any, credited to any account of a Participant will constitute "Recognized Compensation" for purposes of the Qualified Plan, as such terms are defined in such plan, nor any other employee benefit plan of the Company or its Affiliates.

**8.6    Voting Rights**.  Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

**8.7    Governing Law**.  This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

-18-

## SECTION 9
## AMENDMENT OR TERMINATION

**9.1     Amendments to and Termination of Plan**.  While the Company intends for the Plan to continue indefinitely, it may be amended or terminated at any time by the Committee or the Board of Directors of the Company or by the Company, including, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; provided, however, that no such amendment or termination will have the effect of (i) reducing the vested portion of amounts already credited to a Participant's account; (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A.  In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

**9.2     Merger**.  The Committee may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company.  If the Committee agrees to such a merger, the Committee will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

**9.3     Applicability to Successors**.  This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries.  If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

60673594_5

Decl. of G. Sikich - 26

**III**

YARMUTH WILSDON CALFO

ATTORNEYS AT LAW

Richard C. Yarmuth
DIRECT 206.516.3870
yarmuth@yarmuth.com

December 14, 2009

**VIA E-MAIL and U.S. MAIL**

Todd W. Schnell
Vice President – Senior Associate General Counsel
Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN  55402-4422

      Re:   Karl Leaverton

Dear Todd:

      On more than one occasion my client, Karl Leaverton, has requested full vesting of his vested, mandatory, and unvested value in the Wealth Accumulation Plan ("WAP") and distribution of those assets on the schedule he previously elected.  As previously explained, he is entitled to full vesting and the scheduled payout because he meets the qualifications of "Retirement" under the WAP and has offered (and stands ready) to execute a non-solicitation and non-competition agreement in a form similar to Paragraphs 14(a) and (b) of RBC's proposed severance agreement.

      Despite that Mr. Leaverton is entitled to full vesting under WAP § 4.2(a) and that WAP proceeds must be paid out in installments as he previously elected under WAP § 5.3(b), RBC has indicated that Mr. Leaverton will not be fully vested and that he will be required to take a lump-sum distribution of WAP proceeds in the summer of 2010.  Additionally, RBC has failed to provide written notice specifying (a) the reasons for this determination, (b) the WAP provisions RBC believes permit this determination, (c) additional relevant information, and (d) a description of the WAP's review procedures, including a statement regarding the right to bring a civil action under ERISA Section 502(a).  WAP § 7.3 requires RBC to provide this information.  RBC has not timely done so.  Please provide this information immediately.  Thank you.

                    Sincerely,

                    Richard C. Yarmuth

cc:   Karl Leaverton

Decl. of G. Sikich - 27

**EXHIBIT B**

T  206.516.3800
F  206.516.3888

578.01 jl141501 12/14/09

**ili**

YARMUTH WILSDON CALFO

ATTORNEYS AT LAW

Richard C. Yarmuth
DIRECT 206.516.3870
yarmuth@yarmuth.com

May 11, 2009

John Taft
RBC Wealth Management
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

> *Confidential*
> *For settlement purposes only*
> *subject to Rule of Evidence 408*

Re:  Karl Leaverton

Dear Mr. Taft:

This firm represents Karl Leaverton with respect to his termination from RBC Wealth Management. I am writing to follow up on my letter to you dated May 5, 2009.

For the reasons described below, RBC's termination of Mr. Leaverton was wrongful and misguided, and violated various laws against age discrimination. Under those laws, Mr. Leaverton is entitled to significant compensation for RBC's illegal actions. The purpose of this letter is to explain Karl's position to you and to RBC, and to see what steps and further actions logically should follow.

As you know, on April 13, 2009, you and Mr. Leaverton had a telephone conversation in which you informed Mr. Leaverton that you were terminating his employment with RBC "immediately." In that conversation you stated that Mr. Leaverton had done "a great job," "an excellent job" and "everything I have asked of you and more." However, when Mr. Leaverton pressed you on RBC's reason for terminating him, you explained that you were "trying to clear the runway for younger talent" and "to give some younger people a chance to see what they can do."

Altogether the reason you gave Karl for firing him was an embarrassingly clear violation of both state and federal law, you made no secret of, and oft repeated, your discriminatory purpose in later conversations and meetings at RBC. For example, on April 21, you repeated the "younger talent" theme at three separate meetings with RBC personnel — at a morning meeting in RBC's Seattle conference room, an afternoon meeting in the Kirkland office, and at a dinner meeting at the Heathman Hotel in Portland. During those meetings you explained your decision to fire Karl to his former colleagues by repeatedly referencing RBC's need for "younger talent;" stating that although it was "a tough decision that would save the jobs of numerous staff," the firing of Karl Leaverton would "pave the way for younger talent;" that Karl had to be let go because of his age

T 206.516.3800
F 206.516.3888

818 STEWART STREET, SUITE 1400  |  SEATTLE, WASHINGTON 98101                     www.yarmuth.com

**EXHIBIT C**

Decl. of G. Sikich - 28

John Taft
May 11, 2009
Page 2

— saying that "we have a lot of younger talent coming up and they need the opportunity;" and identifying Jeff Mallula, Mary Zimmer and Mike Kavanagh as the "younger talent" that would replace Karl.

Similarly, it has been reported that in follow up conversations with some of those who were present at the April 21 meetings, as well as in conversations in Minneapolis, you openly repeated that it was Karl's age and the need for "younger talent to have an opportunity" to fill both positions Karl was fired from — Co-President and Northwest Regional Director — to be a principal factor in RBC's decision to fire Karl Leaverton.

*Liability*

Although your repeated admission that RBC's motivation for terminating Mr. Leaverton was related to his age (53 years) is striking for its candor — it nonetheless subjects RBC to significant liability for age based discrimination. These admissions assure that, should Mr. Leaverton be compelled to sue, this matter will proceed to a jury. Put simply, there is no possibility whatever that this matter will be resolved in RBC's favor on a motion to dismiss, motion for summary judgment, or similar motion short of trial. *See, e.g., deLisle v. FMC Corp.*, 57 Wn. App. 79, 84, 786 P.2d 839 (1990) ("[S]ummary judgment in favor of employers is seldom appropriate in employment discrimination cases."); *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (Plaintiff "require[s] very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record."). Any indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder, in this case, the jury. *Schnidrig*, 80 F.3d at 1410.

RBC's conduct is actionable as age discrimination under both state and federal laws.

RBC's conduct plainly violates the Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60. That law forbids discharging "any person from employment because of age." RCW 49.60.180(2). To establish an age discrimination claim under the WLAD, a plaintiff need only prove (1) that the defendant terminated the plaintiff, and (2) that age was a "substantial factor" in the defendant's decision to terminate. *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995).

A factor is "substantial" if it was a significant motivating factor in the termination; it need not have been the only factor or even the main factor in the decision to terminate. *Id.; see also* Wash. Pattern Jury Instr. 330.01.01. Thus, the presence of other reasons for RBC's decision — including alleged cost savings and structural reorganization — is not a defense or a justification if age was a "substantial factor" in RBC's decision — as you repeatedly have admitted it was.

John Taft
May 11, 2009
Page 3

The Washington Legislature has declared age discrimination, like that RBC committed against Mr. Leaverton, to be a "menace" to society:

The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of . . . age . . . [is] a matter of state concern, that *such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.*

RCW 49.60.010 (emphasis added). *See, also,* RCW 49.44.090 (recognizing that it is an unfair business practice to terminate an employee because he or she is forty years of age or older).

RBC's conduct similarly violates federal law. The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* forbids any employer from discharging an individual because of age. 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer to hire or discharge any individual . . . because of such individual's age."). Indeed, the United States Supreme Court has recognized that federal legislation prohibiting age discrimination "reflects a societal condemnation of invidious bias in employment decisions." *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 357 (1995).

Thus, proof of RBC's liability will be simple to prove, and the only question for the jury then will be the amount of damages to which Mr. Leaverton will be entitled.

## Damages

The damages for which RBC will be liable — for RBC "trying to clear the runway for younger talent" — are significant.

Under the state law, WLAD, an employee wrongfully terminated on account of age is entitled to (a) the value of lost past earnings and benefits from the date of termination to the date of trial ("back pay"), (b) the reasonable value of lost future earnings and benefits ("front pay"), and (c) damages attributable to the emotional distress caused by the wrongful termination. *See, e.g,* *Dean v. Municipality of Metropolitan Seattle-Metro,* 104 Wn.2d 627, 640-41, 708 P.2d 393 (1985); *Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 510-14 (9th Cir. 2000) (damages under WLAD); Wash. Pattern Jury Instr. 330.81.

Similarly, under the federal law, ADEA, an employee wrongfully terminated on account of age is entitled to both back and front pay. *See, e.g., Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1346-47 (9th Cir. 1987). If the jury finds that RBC's age discrimination was willful — which based upon even the limited record now available to us we are confident it will — Mr. Leaverton will be entitled to *double* back pay damages. *Id.* at 1348.

Decl. of G. Sikich - 30

John Taft
May 11, 2009
Page 4

Additionally, under both the WLAD and the ADEA, Mr. Leaverton will be entitled to recover the costs of this litigation and his attorney's fees, which are likely to be substantial. RCW 49.60.030(2); 29 U.S.C. §§ 216(b), 626(b).

Based upon these laws, Mr. Leaverton – as a highly compensated executive -- is entitled to more than $          in damages for RBC's wrongful termination of him. Nevertheless, if this matter can be amicably resolved within the next 30 days, Karl Leaverton is willing to accept the following settlement:

1.     That he be allowed to retire and be vested in his vested, mandatory and unvested value of his Wealth Accumulation Plan and be granted retirement vesting according to the grant schedule of the Long Term Incentive (LTI) Program with PSU-US and RSU-US units previously awarded;

2.     That he receive a one-time cash payment of          calculated as         , for 2009 (Karl's targeted compensation less amounts previously received); and compensation of          for each of 2010, 2011 and 2012 (targeted value of each year's          :alary, Short Term Incentive bonus,          Long Term Incentive and          WAP match); and

3.     That he receive health care benefits for    years (until age    ), for himself and his wife.

In this day and age, it is rare to have such a clear case of age discrimination. Indeed, most cases require statistical analyses or proof of nuanced patterns in order to prove what RBC admits in this instance that it did — fired Karl Leaverton (despite his having done "a great job" and "an excellent job") because, among other things, he was 53 years old and RBC wanted "to clear the runway for younger talent." And because you repeated RBC's "invidious bias in this employment decision" to so many other RBC personnel — and because we believe that documents in RBC's files will corroborate this pernicious conduct — we believe that RBC's illegal conduct will not be difficult to prove.

Accordingly, if this matter is not settled and Karl Leaverton files his lawsuit against RBC, Karl will have his day in court. There will be no basis for this case to be dismissed prior to trial, and he will present clear and convincing evidence of RBC's age discrimination towards him and others, the significant economic harm that he has and will suffer, and his damages attributable to the emotional distress caused by RBC's wrongful termination.

A copy of this letter is being sent to Dan Torbenson, who I understand to be General Counsel of RBC Wealth Management-USA. If RBC would like to discuss these matters further, I look forward to hearing from Mr Torbenson or his designee. If I do not receive a response within

**REDACTED**

John Taft
May 11, 2009
Page 5

10 days, I will assume RBC does not want to further discuss this matter and Karl will proceed with his lawsuit.

      Thank you.

                            Sincerely,

                            Richard C. Yarmuth

RCY:jr

cc:     Dan Torbenson, General Counsel
        Lisa Sorenson, Head of Human Resources

578.01 je041501 5/11/09



Todd W. Schnell
Vice President -
Senior Associate General Counsel
Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402-4422
Fax:    866-947-4603
Direct: 612-371-7263
todd.schnell@rbc.com

March 8, 2010

**VIA FACSIMILE (206-516-3888) & OVERNIGHT MAIL (206-516-3800)**
Mr. Richard C. Yarmuth
818 Stewart Street, Suite 1400
Seattle, Washington 98101

> *Re:    RBC U.S. Wealth Accumulation Plan:*
> *Mr. Karl Leaverton Claim*

Dear Mr. Yarmuth:

The RBC US Wealth Accumulation Plan ("Plan") Committee has reviewed your letter to Todd W. Schnell of December 14, 2009 in which you asserted a claim with respect to Mr. Leaverton's Plan account.  This letter is sent on behalf of and at the direction of the Committee.

<u>**Claim for Unvested Company Contributions**</u>

For the reasons described below, the Committee understands the claim in the December 14 letter for "full vesting" of Mr. Leaverton's "vested, mandatory, and unvested value" in the Plan to consist, in particular, of a claim for Mr. Leaverton's unvested Company Contributions ("Claim").

Based on its review, the Committee determined that Section 7.3 of the Plan required Mr. Leaverton to deliver his Claim within 90 days of when he knew or should have known of such Claim.  The delivery of your December 14 letter, while technically not delivered to the Committee but accepted by the Committee, was made more than 90 days after Mr. Leaverton knew or should have known of the status of his unvested Company Contributions.  The Committee next reviewed your letter to John Taft of May 11, 2009, to determine whether it stated a claim for unvested Company contributions.  Based on the nature of that letter and the language contained therein, the Committee determined that it did not constitute a claim under the Plan, but at best constituted a settlement demand based on allegations asserted by Mr. Leaverton.  Accordingly, the Committee concluded that Mr. Leaverton did not satisfy the requirements of Section 7.3 and his Claim must therefore be denied.

The Committee then considered, notwithstanding the previous determination of an untimely Claim, if the Claim had been determined to be timely, whether Mr. Leaverton should have been credited with full vesting of his Company Contributions in connection with his separation from service.  If Mr. Leaverton made a timely claim for benefits

RBC Wealth Management, a division of RBC Capital Markets Corporation, Member NYSE/FINRA/SIPC

**EXHIBIT D**

under Section 7.3 of the Plan, he still would be required to satisfy the requirements of Section 4 for vesting of the Company Contributions to his WAP Account. Under Section 4.2(b), a Participant's Company Contributions will immediately vest in full only if (a) his Separation qualifies as a "Retirement," as defined in the Plan, and if (b) he enters into a non-competition, non-solicitation and related agreement at the employer's request. Mr. Leaverton satisfied the definition of "Retirement" under the Plan. Mr. Leaverton did not, however, enter into the agreement proffered to him. Thus Mr. Leaverton did not satisfy the requirements of Section 4.2(b) and his Claim is alternatively denied on this basis as well.

The Committee is not aware of any additional information needed in connection with Mr. Leaverton's Claim for full vesting of his unvested Company Contributions. Mr. Leaverton has the right to request a review of the Claim denial set forth herein by submitting a request, in writing, that must be delivered to the Committee within 60 days of the date of this letter. The specific requirements for Mr. Leaverton's request and a description of the review process are set forth in Section 7.4 of the Plan. Any such request may be directed to my attention on behalf of the Committee. Further, Mr. Leaverton is advised that he has the right to bring a civil action under ERISA Section 502(a) following any adverse determination upon appeal.

### Administrative Inquiry

During the Committee's meeting, the Committee reviewed Mr. Leaverton's inquiry into the payment schedule under which he will receive his vested contributions to his Plan account. This includes Mr. Leaverton's Voluntary Deferred Compensation pursuant to Section 4.1 and his Mandatory Deferred Compensation under Section 4.4 (based on his termination of employment due to an organizational restructuring associated with cost cutting efforts in early 2009). In 2006, Mr. Leaverton elected a Separation distribution of 10 annual installments. Because Mr. Leaverton satisfied the definition of "Retirement" and experienced a "Separation" from employment, as each is defined in the Plan, Mr. Leaverton will receive payment of his vested contributions in accordance with his Separation distribution election. Accordingly, the first of 10 annual installment payments will commence promptly after, but in no event after the 90th day following, July 1, 2010, pursuant to the terms and conditions of Section 5.3(b)(iii) and all other applicable provisions of the Plan.

Please contact me if you have any questions.

Sincerely,

Todd W. Schnell

cc:  Plan Committee

Decl. of G. Sikich - 34