1

Hon. Robert S. Lasnik

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

KARL LEAVERTON, an individual,

            Plaintiff,

11

12

        v.

13

RBC CAPITAL MARKETS
CORPORATION, a Minnesota
corporation; ROYAL BANK OF
CANADA, a Canadian corporation;
ROYAL BANK OF CANADA US
WEALTH ACCUMULATION PLAN, an
employee benefit plan; and JOHN DOES
1-15, individuals,

            Defendants.

14

15

16

17

18

No. 2:09-cv-1804 RSL

DECLARATION OF KARL
LEAVERTON IN OPPOSITION TO
DEFENDANTS' SECOND MOTION
TO DISMISS

NOTED ON MOTION CALENDAR:
April 2, 2010

**ORAL ARGUMENT REQUESTED**

19

20

        I, Karl Leaverton, declare as follows:

21

        1.      I am over the age of eighteen and otherwise competent to testify herein.  I

22

make the following statements based on my own personal knowledge.

23

        2.      I had a long career at defendant Royal Bank of Canada Wealth Management,

24

a division of defendant RBC Capital Markets Corporation ("RBC") and its predecessor

25

firms, Dain Bosworth and Dain Rauscher.  Before I was terminated from RBC, I was Co-

26

President and Northwest Regional Director of RBC Wealth Management.

DECLARATION OF KARL LEAVERTON IN
OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS
NO. 2:09-cv-1804 RSL – Page 1

lıı
YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1        3.      On April 13, 2009, I had a telephone conversation with John Taft, the head

2   of RBC Wealth Management.  In that conversation, Mr. Taft informed me that RBC was

3   terminating my employment as Co-President and Northwest Regional Director of RBC

4   Wealth Management immediately.

5        4.      Shortly after RBC fired me I received a proposed severance agreement from

6   RBC Wealth Management, a true and correct copy of which is attached to this declaration

7   as Exhibit 1.  Specific financial terms of that proposed severance agreement have been

8   redacted.

9        5.      Irrespective of RBC's proposed severance agreement (that is, whether or not

10  I accepted the agreement), I believed that my termination from RBC met the definition of

11  "Retirement" under Royal Bank of Canada's US Wealth Accumulation Plan (the "WAP").

12  (A copy of the WAP that was in effect at the time I was terminated from RBC is attached as

13  Exhibit A to the Declaration of Gabriela Sikich (Dkt. # 8).)  Because my termination met

14  the definition of "Retirement" under the WAP, and because I was and remain willing to

15  enter a one-year non-competition and non-solicitation agreement with RBC, I believed that

16  under Section 4.2 of the WAP I was entitled to "full vesting" under the WAP.  Put another

17  way, I believed that I was entitled not only my Voluntary Deferred Compensation, but also

18  my Mandatory Deferred Compensation and Company Contributions under the WAP, and

19  that funds in the WAP would be paid out over ten years as I had previously elected.

20       6.      On April 23, 2009, I had a telephone conversation with Lisa Sorenson, RBC

21  Wealth Management's Director of Human Relations.  In that conversation I asked whether

22  the proposed severance package included "full vesting" under the WAP.  The next day Ms.

23  Sorenson sent me an email that stated that RBC "did take into consideration the value of

24  [my] unvested WAP from years 2004 through 2008."  Based on Ms. Sorenson's email, I did

25  not understand whether or not under the proposed severance package I would be fully

26  vested under the WAP.  I therefore sent an email to Ms. Sorenson later that day asking for

DECLARATION OF KARL LEAVERTON IN
OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS
NO. 2:09-cv-1804 RSL – Page 2

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1    clarification.  A true and correct copy Ms. Sorenson's email to me and my response to her is

2    attached to this declaration as Exhibit 2.  Specific financial terms discussed in that email

3    have been redacted.

4           7.    On May 5, 2009, I had a telephone conversation with Ms. Sikich, RBC's

5    WAP Manager.  In that conversation Ms. Sikich confirmed my understanding set forth in

6    Paragraph 5 above.  Ms. Sikich confirmed that I met the "Rule of 60" and would qualify for

7    "Retirement" under the WAP and that my distributions under the WAP would be paid out

8    over ten years as I had previously elected. (The "Rule of 60" requires that in order to meet

9    the definition of "Retirement" under the WAP, a participant's age and years of employment

10    when combined equals or exceeds 60.  *See* WAP § 1.2.)  Ms. Sikich also confirmed to me

11    that if I signed a one-year non-competition and non-solicitation agreement, I would be

12    "fully vested" under the WAP, *i.e.*, entitled to my vested and unvested values under the

13    WAP.

14           8.    Based upon Ms. Sikich's representation, I immediately emailed my RBC

15    financial consultant, Dave Sogge, to inform him that Ms. Sikich had confirmed that I would

16    be vested and that my distributions under the WAP would be paid out over ten years as I

17    had previously elected.  A true and correct copy of my email to Mr. Sogge is attached

18    hereto as Exhibit 3.

19           9.    RBC has never provided me a one-year non-competition and non-solicitation

20    agreement that did not require me to release my age discrimination and other claims against

21    RBC.  In all of my years at RBC I have never known of an instance in which a WAP

22    participant who met the "Rule of 60" and who was willing to execute a one-year non-

23    competition and non-solicitation agreement was not "fully vested" under the WAP.

24    Further, I know of at least two instances in which individuals were short of sufficient years

25    of service to the firm, but were carried as employees in non-active roles to reach that

26

DECLARATION OF KARL LEAVERTON IN
OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS
NO. 2:09-cv-1804 RSL – Page 3

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

benefits.

10.     Sometime after my conversation with Ms. Sikich, Ms. Sorenson informed me that I was not entitled to my Mandatory Deferred Compensation and Company Contributions. At the time of my termination those funds were worth several hundred thousand dollars. Ms. Sorenson further explained that my Voluntary Deferred Compensation would be paid out in one lump sum instead of over a ten year period as I had previously elected. I did not understand how – in direct contravention of what Ms. Sikich told me – I would not be vested in my Mandatory Deferred Compensation and Company Contributions or why my Voluntary Deferred Compensation would be paid in a lump sum, instead of over a ten year period as I had previously elected. Ms. Sorenson explained to me that the WAP committee can "change the rules under special circumstances."

11.     On September 10, 2009, I sent a letter to Gordon Nixon, the President and CEO of Royal Bank of Canada, and George Lewis, the Group Head of Wealth Management for the Royal Bank of Canada. A true and correct copy of that letter is attached to this declaration as Exhibit 4.


I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.


Dated March 29, 2010, at _Bellevue_, Washington.

Karl Leaverton

DECLARATION OF KARL LEAVERTON IN
OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS
NO. 2:09-cv-1804 RSL – Page 4

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101

# EXHIBIT 1

## AGREEMENT AND RELEASE

This Agreement and Release ("Agreement") is between Karl Leaverton ("Leaverton") and RBC Wealth Management, a division of Capital Markets Corporation ("RBC").

WHEREAS, Leaverton has been advised that his employment will be terminated, effective April 15, 2009, from RBC as set forth in this Agreement; and

WHEREAS, the parties wish to set forth here their understanding regarding severance arrangements and certain other matters in connection with the termination of Leaverton's employment at RBC; and

WHEREAS, the parties wish to settle, compromise and resolve any and all claims Leaverton has or may have against RBC or any of the RBC Released Parties (as defined below).

NOW, THEREFORE, the parties agree as follows:

1.      Leaverton's employment will terminate effective April 15, 2009 (the "Termination Date").

2.      RBC will pay Leaverton the sum of REDACTED less all applicable deductions and withholdings as required by law, within thirty (30) days following the Execution and Non-Revocation of this Release.

3.      Leaverton agrees that he is not entitled to any of the payments specified in paragraph 2 absent execution of this Agreement and subject to him not revoking that acceptance.

4.      Leaverton understands that if he participated in the RBC Compensation Administration Program, Policy 3.5 (the "CAP Plan") the value of the deferred compensation that he is entitled to under Section 3.15.17(1) of the CAP Plan is payable in accordance with the terms of the CAP Plan over the vesting period. Leaverton further understands that if he participated in the RBC Wealth Accumulation Plan (the "WAP") his vested balance (as defined in the WAP) shall be paid in accordance with the terms of the governing plan documents.

5.      Leaverton understands that if he previously elected to defer part or all of his Short Term Incentive ("STI") payment, such deferral election is not applicable to any discretionary pro-rated bonus payable on account of involuntary termination as part of the lump sum payment described in paragraph 2.

6.      (a)      In exchange for the payments and benefits provided for in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Leaverton hereby forever unconditionally and irrevocably releases and discharges RBC, Royal Bank of Canada, RBC Capital Markets Corporation, RBC Capital Markets Holdings (USA) Inc., RBC Holdings (USA) Inc., RBC Bank (USA), Liberty Life Insurance Company, RBC TCEG, LLC, J.B. Hanauer & Co., The Hill Thompson Group, Ltd., Ferris, Baker Watts, LLC, Voyageur Asset Management Inc., and each and all of their direct and indirect affiliates, parents, subsidiaries (wholly-owned or not), members, branches, divisions,

business units or groups, agencies, predecessors, successors and assigns, any employee benefit plans established or maintained by any of the foregoing entities and each and all of their current and former officers, directors, employees, trustees, plan administrators, agents, attorneys, representatives, partners, advisors and shareholders (collectively and individually, the "RBC Released Parties"), from any and all claims, demands, causes of action, complaints, agreements, promises (express or implied), contracts, undertakings, covenants, guarantees, grievances, liabilities, damages, rights, obligations, expenses, debts and demands whatsoever, in law or equity, known or unknown, whether present or future, whether known or unknown, and of whatsoever kind or nature that Leaverton, his heirs, executors, administrators, representatives and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any alleged or actual matter, omission, act, cause or thing from the beginning of time until the date he signs this Agreement, including, but not limited to, those arising out of, in connection with or relating in any way to the terms and conditions of Leaverton's employment or the termination thereof.

(b)     Leaverton understands and acknowledges that by signing this Agreement he is waiving and releasing any and all claims he may have concerning the terms and conditions of his employment and the termination of his employment under any U.S. or Canadian law or the laws of any state, city, province, locality or commonwealth, including those prohibiting discrimination on the basis of age, sex, race, color, disability, religion, creed, national origin, ancestry, sexual orientation, gender expression, gender identity, handicap, pregnancy, marital status, citizenship or any other protected factor or characteristic, prohibiting discrimination for requesting or taking a family or medical leave, prohibiting discrimination with regard to benefits or any other terms and conditions of employment, or prohibiting retaliation in connection with any complaint or claim of alleged discrimination or harassment and that he intends to do so. As such, this release includes, but is not limited to, any claims arising under Title VII of the 1964 Civil Rights Act, 42 U. S. C. § 2000e *et seq.*; the Age Discrimination in Employment Act, 29 U. S. C. § 621, *et seq.*; the Older Workers' Benefit Protection Act, 29 U.S.C. §626(f), *et seq.*; the Americans with Disabilities Act, 42 U. S. C. § 12101 *et seq.*; the Employee Retirement and Income Security Act, 29 U. S. C. § 1001 *et seq.*; the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.*; the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, Washington Law Against Discrimination in Employment and Washington Civil Rights Act, Wash. Rev. Code § 49.60.010 *et seq.*; Wash. Rev. Code, § 49.44.090 [Age Discrimination]; Washington Family Care Act, Wash. Rev. Code, § 49.12.005 *et seq.*; Washington Family Leave Act, Wash. Rev. Code, § 49.78 *et seq.*; and any other federal or state constitutions, federal, state or local statutes, or any contract, quasi contract, common law or tort claims, whether known or unknown, suspected or unsuspected, concealed or hidden, or developed or undeveloped, up through the date of his execution of this release. Leaverton further agrees that he will not institute or authorize any other party, governmental or otherwise, to institute any administrative or legal proceeding seeking compensation or damages on his behalf against the RBC Released Parties relating to or arising out of any aspect of his employment or termination.

(c)     Leaverton hereby intends to expressly waive and relinquish, to the fullest extent permitted by law, all claims he may have, whether or not known or suspected to exist in his favor at the time of executing this Agreement. Leaverton further acknowledges that he is aware that he may hereafter discover facts in addition to or different from those which he

now knows or believes to be true with respect to the subject matter of this Agreement, but it is his intention to, and he does fully, finally and forever settle and release any and all claims against the RBC Released Parties in any forum whatsoever, relating in any way to the claims being released herein, whether known or unknown, suspected or unsuspected, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or existence of such different additional facts.

7.      Leaverton further represents that he has not instituted, and agrees not to institute, any claim for damages, affirmative relief, judgments, or attorneys' fees, nor authorize or assist any other party, governmental or otherwise, to institute or prosecute any claim to recover damages, affirmative relief, judgments, or attorneys' fees on the Leaverton's behalf via administrative or legal proceedings against the RBC Released Parties, its predecessors, successors, assigns, subsidiaries, parent companies and affiliates and all officers, employees and agents of those persons and companies as a result of any claims of any kind or character which Leaverton might have against them arising from or related to any matter, fact or thing occurring prior to the date of this Agreement including, without limitation, Leaverton's employment with RBC and/or the cessation of his employment with RBC.

8.      (a)      Leaverton acknowledges that the severance benefits set forth in paragraph 2 constitute adequate consideration for this Agreement. This Agreement does not preclude Leaverton from pursuing equitable relief before an administrative agency or providing assistance to others who do so. Any claim, charge, or remedy that cannot by law be waived by a private agreement such as this Agreement is not waived by virtue of the terms of this paragraph.

(b)      Additionally, Leaverton does not, in paragraph 6, release, or waive or discharge his right to file a federal, state or local charge of discrimination for equitable relief only. Leaverton may, and hereby waives, his right to monetary relief from any such charge. Leaverton also acknowledges that he has the right to participate as a witness in any administrative proceeding whether compelled by process to do so or not.

9.      Leaverton represents that he has reported all hours worked and has received pay for all time for which he worked and does not have any outstanding claims for unpaid wages, commissions or bonuses. Leaverton further represents that he was not denied a request for leave, or retaliated against for taking leave under the Family and Medical Leave Act, 29 U.S.C. §§2601 *et seq.*, at any time during his employment with RBC.

10.     Leaverton hereby acknowledges that he has read this Agreement, has had an adequate opportunity to review its terms and consult with legal counsel, understands its terms and consequences and is executing it freely and voluntarily.

11.     (a)      Both Leaverton and RBC understand and agree that the confidentiality of this Agreement is important, and hereby agree that both the existence and terms of this Agreement will not be disclosed by RBC, except to those individuals with a need to know, and will not be disclosed by Leaverton without the prior written consent of RBC, except to his immediate family, attorney or accountant, and then only after securing the agreement of such individual to maintain the confidentiality of this Agreement, or in response to a subpoena or other legal process. In the event Leaverton receives a subpoena related to his employment with

RBC, he shall promptly notify Todd W. Schnell (or his successor) in writing so that RBC will have adequate time to consider and take any appropriate action to object to such disclosure or preserve the confidentiality of any information sought.

(b)     Following the termination of his employment, Leaverton agrees to cooperate fully in all respects with the RBC Released Parties in connection with any and all existing or future claims, investigations, arbitrations, proceedings, litigations or examinations involving any of the RBC Released Parties which relate to his service.  This shall include, without limitation, making himself available on reasonable notice for interviews and other communications with in-house and outside counsel acting on behalf of RBC in connection with any such matter and appearing without a subpoena for a deposition or to give testimony in any hearing, trial or arbitration at the request of RBC.  Leaverton shall be reasonably compensated for his time.

(c)     For the avoidance of doubt, nothing in this paragraph or elsewhere in the Agreement is intended in any way to prevent Leaverton from testifying fully and truthfully in any action or proceeding or in connection with any regulatory matter.

12.     Leaverton represents that during his employment he had access to and possession of confidential and proprietary information about the RBC Released Parties, their clients or prospective clients, including but not limited to, internal personnel information, financial, marketing and other business information, manner and method of conducting business, strategic, operations, and other business plans and forecasts, information provided by, relating to or regarding a party's employees, customers, vendors, and consultants, and customer information.  Leaverton agrees that he will not, without the prior written consent of RBC, at any time disclose to any person or use to his benefit or the benefit of others any such information unless such information has been previously disclosed publicly by the RBC Released Parties or is required to be disclosed by law.

13.     Leaverton represents that he has returned to RBC all company property and equipment of any kind in his possession or control.  This includes computer equipment (hardware and software), telephones and other communications devices, credit cards, office keys, security access cards, badges, identification cards and all copies (including drafts) of any documentation or information (however stored), relating to the business of the RBC Released Parties, their clients or prospective clients.  In addition, Leaverton represents that he does not have any company property on any computer he has used (excluding those at RBC's offices).

14.     Post-Employment Restrictive Covenants.  In further exchange for the consideration provided in paragraph 2 above, Leaverton agrees to the following:

(a)     **Non-Solicitation of Clients and Employees.**  Leaverton agrees that for twelve (12) months following the Termination Date, Leaverton will not directly or indirectly:

(i)     initiate contact with, or solicit the business of, any client serviced by RBC at the time of Leaverton's termination;

Page 4 of 7

(ii)    notify any client serviced by RBC at the time of Leaverton's termination that he is anticipating, has decided to, or has, left the employ of RBC or accepted employment from any broker-dealer or investment banking firm other than RBC;

(iii)    solicit, encourage, or aid in the solicitation of the transfer of any client from RBC;

(iv)    recruit, solicit, or hire, or aid in the recruitment, solicitation, or hiring of, any RBC employee for employment with any broker-dealer or investment banking firm other than RBC.

(b)    **Non-Competition.** Leaverton agrees that for twelve (12) months following the Termination Date, Leaverton will not perform any services for, or otherwise participate, directly or indirectly, as an owner, agent, employee, officer, or consultant, in the business of any broker/dealer or registered investment adviser, or any other entity engaged in any business substantially similar to or competitive with the business that RBC, or any RBC affiliate, is engaged in, in any State or Country in which RBC or any RBC affiliate has an office.

(c)    **Injunctive Relief.** The parties hereto agree that in the event of a violation of paragraph 12, 13, or 14, RBC may apply for and obtain from any state or federal court a temporary restraining order ("TRO") or injunction prohibiting the violation of this paragraph, pending arbitration and a decision of the arbitration panel. Leaverton hereby consents to the entry of such a TRO or injunction. Furthermore, in the event that an award or order for injunctive or other relief shall be granted to RBC in enforcing this Agreement, Leaverton agrees to pay any and all reasonable costs and expenses of RBC (including attorney's fees) incurred in obtaining such relief.

15.    Leaverton agrees that he will not, at any time, disparage, criticize or ridicule RBC, nor make any negative public comments regarding RBC. RBC agrees that it will instruct its relevant employees to not at any time disparage, criticize or ridicule, or otherwise make any negative public comments regarding Leaverton.

16.    This Agreement amicably resolves any issues between the parties and they agree that this Agreement shall neither be interpreted nor construed as an admission of any wrongdoing or liability on the part of Leaverton or any of the RBC Released Parties.

17.    Leaverton agrees that if he is employed with any of the RBC Released Parties within six (6) months of receipt of any benefits described in paragraph 2, RBC is entitled to reduce Leaverton's wages by a prorated portion of the benefits received pursuant to this Agreement.

18.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

19.    The provisions of this Agreement are severable. If any provision of this Agreement is held invalid or unenforceable, such provision shall be deemed deleted from this Agreement and such invalidity or unenforceability shall not affect any other provision of this

Agreement, the balance of which will remain in and have its intended full force and effect; provided, however that if such invalid or unenforceable provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to have been modified so as to be valid and enforceable to the maximum extent permitted by law.

20.    In the event Leaverton breaches this Agreement, RBC's obligations shall cease and it shall be entitled to recover all amounts paid under this Agreement in addition to any other remedies at law or in equity it may have.

21.    Leaverton understands that he has a period of twenty one (21) calendar days from the date hereof to accept this Agreement. If a signed Agreement is not returned to Lisa Sorenson within that time, the offer to enter into this Agreement shall expire and Leaverton will not be eligible to receive the payments and benefits described in this Agreement.

22.    Leaverton is entitled to revoke this release insofar as it extends to claims or potential claims under the Age Discrimination in Employment Act by delivering a written notice of his intent to revoke this release, postmarked or hand-delivered, within seven (7) calendar days following his signing of the Agreement. The rescission must be sent by certified mail or hand-delivered to:

Lisa Sorenson
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

This Agreement will not become effective until this seven (7) day period has expired.

23.    This Agreement shall be binding on and shall inure to the benefit of Leaverton's heirs, executors, administrators, representatives and assigns and RBC's successors in interest and assigns. Leaverton may not assign any of his rights or duties hereunder, except with the written consent of RBC. Leaverton covenants and represents that he has not assigned or attempted to assign any rights or claims he may have against any of the RBC Released Parties at any time prior to signing this Agreement.

24.    This Agreement contains the entire agreement between the parties and supersedes and cancels any prior agreement or understanding on the subjects covered herein, and no agreements, representations or statements of either party not contained in this Agreement shall bind that party. This Agreement can be modified only in writing signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement.

Karl Leaverton                                    RBC Wealth Management, a division of RBC
                                                  Capital Markets Corporation
_____                   By: _____


Date: _____                     Date: _____

Decl. K. Leaverton, Exh. 1
No. 2:09-cv-1804 RSL, Page 12

# EXHIBIT 2



Karl Leaverton <kvls08@gmail.com>

## Wap Information
2 messages

---

Sorenson, Lisa (RBC Wealth Mgmt) <Lisa.Sorenson@rbc.com>                 Fri, Apr 24, 2009 at 9:18 AM
To: Karl Leaverton <kvls08@gmail.com>

Karl,

Sorry for my delay in responding to you yesterday. The amount listed in your agreement of [REDACTED] includes your standard severance amount under the Severance Plan, plus a discretionary amount for the non-solicit and non-compete. When calculating the discretionary component, we did take into consideration the value of your unvested WAP and unvested PDSP amounts. It includes the approximate replacement value for your unvested WAP from years 2004 through 2008. The total also includes the value of the PDSP that would have vested during 2009. Please contact me if you have additional questions.

Regards,

Lisa Sorenson | Director, Human Resources | RBC US Wealth Management | T. 612-371-7241 | F. 866-947-2278

RBC Wealth Management does not accept buy, sell, or cancel orders by e-mail, or any instructions by e-mail that would require your signature. Information contained in this communication is not considered an official record of your account and does not supersede normal trade confirmations or statements. Any information provided has been prepared from sources believed to be reliable but is not guaranteed, does not represent all available data necessary for making investment decisions and is for informational purposes only. This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations. Any distribution, use, or copying of this e-mail or the information it contains by other than an intended recipient is unauthorized. If you receive this e-mail in error, please advise me (by return e-mail or otherwise) immediately. Information received by or sent from this system is subject to review by supervisory personnel, is retained and may be produced to regulatory authorities or others with a legal right to the information. E-mail messages are not encrypted. As such, client sensitive information sent to or received from your RBC Wealth Management Financial Consultant electronically may not be secure. With respect to the companies that are the subject of an equity research report not authored by our firm that is included in this electronic mail message, RBC Wealth Management is required to disclose to you certain conflicts of interest. Any such disclosures may be obtained by either accessing our web site at http://www7.rbccm.com/GLDisclosure/PublicWeb/DisclosureLookup.aspx?EntityID=2 or by mailing a request for such information to RBC Wealth Management Research Publishing, 60 South Sixth Street, Mailstop P18, Minneapolis, MN 55402. RBC Wealth Management, a division of RBC Capital Markets Corporation. Member NYSE/FINRA/SIPC.

---

Karl Leaverton <kvls08@gmail.com>                                         Fri, Apr 24, 2009 at 9:28 AM
To: "Sorenson, Lisa (RBC Wealth Mgmt)" <Lisa.Sorenson@rbc.com>
[REDACTED]

Thanks Lisa. I am a bit confused about the "standard severance amount under the Severance Plan" as I remember that the Plan included up through the Directors level but that we left it open for EC members. If I am remembering wrong, would you please send me a copy of the plan. So if my math is right, the number below includes the [REDAC]unvested WAP, about [REDAC] for the units to come due this December and excludes the other Units valued at about [REDA] So about [REDA] severance? Thanks for helping me understand, it sure isn't clear in that document.
[Quoted text hidden]

---

# EXHIBIT 3

| | |
|---|---|
| from | Karl Leaverton <kvls08@gmail.com> |
| to | "Sogge, Dave (RBC Wealth Mgmt)" <Dave.Sogge@rbc.com> |
| date | Tue, May 5, 2009 at 7:41 AM |
| subject | IMPORTANT!! |

hide details 5/5/09

mailed-by gmail.com

Dave, I just got clarification from Gabi that since I satisfy the rule of 60, I will get a payment of my vested and mandatory over a 10 year period starting next July.  I hope you hadn't started the exercise. I will cal you in a few minutes if I don't se a response from you, thanks.

# EXHIBIT 4

**Karl V. Leaverton**
**14 Crescent Key**
**Bellevue, WA 98006**

September 10th, 2009

Gord and George,

I expect that you are aware of my having been terminated from RBC. It is not clear to me, however, if you have been involved in the particulars of that process – that is, my being offered less than adequate, or historical, severance for the elimination of my Executive position or my illegal termination as a Regional Director (see attached). Before the legal aspects ramp up much further, I am hoping that another set of eyes on the situation would help us find a fair resolution. I have been forced to file a complaint with a government agency and it now becomes part of public record; I'd prefer not to have to take the next step, a lawsuit in federal court here in Seattle.

I am forwarding this information to you in hopes that you will ask Mr. Taft and Mr. Schnell to discuss an adequate and amicable severance prior to FY end 2009. Most disturbing to me was that the proposed severance did not let me retire from the firm, therefore not vesting me in the WAP (giving me my elected 10 year payout) and my LTI, that I earned during the last three years as Co-President of the PCG.

In the nearly 16 years that I have been with the firm and intimately involved in the growth from 680 FCs to the current 2,300 FCs, I have never witnessed a re-organization/termination where an Executive was not allowed to vest their retirement benefits and be compensated for the elimination/termination of their position. That is all I ask – to be treated fairly and consistent with past practices.

I would like to bring this situation to conclusion without any further legal action or potential public scrutiny, but a severance offer without full retirement benefits will force me to move forward. I am asking that my full retirement benefits be reinstated and offered as part of my severance and that Schnell and Taft negotiate a settlement with me and my attorney prior to the end of FY 2009.

Thank you for your consideration.

Karl V. Leaverton
206-250-9700 c
425-653-7712 h